UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                              :

SONIA MENDEZ and ZAIDA MARQUEZ,     :
individually and on behalf of others similarly    :
situated,                                                  :          13-CV-2651 (JPO)
                                  Plaintiffs,   :
                                                  :          FINDINGS OF FACT
                   -v-                     :        AND CONCLUSIONS OF
                                                  :                 LAW
INTERNATIONAL FOOD HOUSE INC. (f/k/a  :
ALBERTO'S MOFONGO HOUSE, d/b/a    :
AROMA DITALIA), ZOILO RAMIREZ, and  :
ALBERTO NUNEZ,                                   :
                                          Defendants.  :
                                                         :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiffs Sonia Mendez and Zaida Marquez brought this action against their former employer for violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law (NYLL) §§ 190 and 650 *et seq.*  The Court held a bench trial from August 4 through August 6, 2014, and now issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.**     **Findings of Fact**

       International Food House Inc., formerly known as Alberto's Mofongo House ("Mofongo House"), is a restaurant located in the Washington Heights neighborhood of New York at 217 Dykman Street.  It is owned by Alberto Nunez ("Alberto") and his wife, Maribel Nunez ("Maribel").  Mofongo House is divided into two sections: a buffet, which is open 24 hours a day, seven days a week, and a restaurant, which opens at noon and becomes a lounge from 11 p.m. until 4 a.m.

Mendez and Marquez are former employees of Mofongo House. Mendez was employed as a buffet waitress from January 2011 through February 4, 2013 and generally worked from 11:30 p.m. until 7 a.m. She was paid at the rate of $5.00 per hour, plus a share of tips. Marquez was employed as a cocktail waitress from April 14, 2010 through November 13, 2012 and generally worked from 11 p.m. until 4 a.m. She was paid $4.60 per hour through June 31; $4.65 per hour from July 1 through December 31, 2010; and $5.00 per hour from January 1, 2011 until the end of her employment.

## II.     Conclusions of Law

Plaintiffs assert claims for violations of the minimum wage and overtime wage provisions of FLSA and the NYLL, the wage statement provisions of the NYLL, and the unauthorized deduction provision of the NYLL.

### A.     Admissibility of Audio Recordings, Transcriptions, and Translations

At the outset, the Court addresses the admissibility of Plaintiffs' Spanish audio recordings, transcriptions, and translations. Defendants object to the admission of this evidence on grounds of authenticity, hearsay, and lack of probative value.

#### 1.     Authenticity

Defendants' authenticity objection is overruled. The proponent of evidence satisfies the authenticity requirement by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The Rule specifically lists as modes of authentication "[t]estimony that an item is what it is claimed to be" and "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(1), (5). Plaintiffs testified that the recordings are in fact recordings of conversations that they made, and identified the speakers on the recordings based

2

upon their familiarity with the speakers' voices and their participation in the conversations. This is sufficient to permit a finding of authenticity. The question is not one of admissibility, but rather credibility.

### 2. Hearsay

Defendants' hearsay objection is sustained in part and overruled in part. The recordings are not hearsay insofar as they contain statements that are not offered for the truth of the matter asserted, or constitute admissions by Defendants' agents made on matters within the scope of their employment. Fed. R. Evid. 801(d)(2)(D). They are also admissible as prior consistent statements made to rebut an express or implied charge that Plaintiffs recently fabricated their testimony or are acting from a recent improper influence or motive. Fed. R. Evid. 801(d)(1)(B). During opening statements, Defendants' counsel opened the door to prior consistent statement evidence when he claimed that Mendez called a former coworker and said the reason for the lawsuit was simply that "[w]e're trying to get some money." (Tr. 9:14.)

Nevertheless, there is an additional level of hearsay that, in many instances, renders the recordings inadmissible. Because the transcribers were unable to discern most of what was said on the recordings, the official translations of the transcriptions omit the bulk of the conversations. At trial, Plaintiffs listened to the recordings and testified as to what they heard, but often their testimony included statements that are not found in the translations, making Plaintiffs the sole interpreters for those portions of the recordings. This is not permissible. While an interpreter is ordinarily "no more than a language conduit" whose "translation does not create an additional level of hearsay," *United States v. Lopez*, 937 F.2d 716, 724 (2d Cir. 1991) (quotation and citations omitted), an interpretation is inadmissible if the translator has a "motive to mislead" or there is "reason to believe the translation is inaccurate," *United States v. Da Silva*,

3

725 F.2d 828, 832 (2d Cir. 1983). An in-court translation by an interested party falls within this exception.

Accordingly, the recordings are inadmissible to the extent that the only translation is provided by Plaintiffs. Where there is an official translation, the statements are admissible so long as they constitute a prior consistent statement, an admission by an agent, or are not offered for the truth of the matter asserted. The recordings also may be used, as they were at trial, to refresh Plaintiffs' memories, but when they are used in this manner they are not admissible as substantive evidence. *See* Fed. R. Evid. 612. In those instances, the only substantive evidence is Plaintiffs' testimony regarding the existence and substance of prior conversations, and the only question is whether that testimony is credible.

### 3. Lack of Probative Value

Defendants argue that the recordings should be excluded because they are too indiscernible and inaudible to have any real probative value. Fed. R. Evid. 403. Recordings are inadmissible on this basis only if "the unintelligible portions are so substantial as to render the recording as a whole untrustworthy [or] . . . without evidentiary value[,] . . . [or] as to render the remainder more misleading than probative." *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir. 1973) (citation and quotations omitted). In light of the Court's hearsay ruling, the probative value of the recordings turns upon whether the official translations—separate and apart from Plaintiffs' testimony—are intelligible. Applying this standard, the Court excludes from evidence Plaintiffs' exhibits 9, 37, and 43;[1] and 49, 54, and 59.

---

[1] The first exhibit is the audio recording, the second is the transcription, and the third is the translation.

4

### B. Minimum Wage Claims

The FLSA and the NYLL generally require employers to pay employees a minimum wage of $7.25 per hour. 29 U.S.C. § 206(a)(1); NYLL § 652; N.Y. Comp. Codes R. & Regs. (NYCRR) tit. 12, § 142–1.2. However, an employer may pay a food service employee at a lower tip credit rate—$5.00 per hour under the NYLL and $2.13 under FLSA—if she "customarily and regularly receives more than $30 a month in tips," and, when her tips are accounted for, she receives the minimum wage per hour. 29 U.S.C. § 203(m), (t); NYLL § 652(4); 12 NYCRR § 146–1.3(b).

There are two caveats to the tip credit provision. First, under the FLSA, an employer "may not avail itself of the tip credit if it require[s] tipped employees to share their tips with employees who do not 'customarily and regularly receive tips.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011) (quoting 29 U.S.C. § 603(m)). "Thus, an employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers." *Id.* (citation omitted). The NYLL similarly provides that employers may not require tipped employees to "share tips with employees who do not perform direct customer service—i.e., employees who are not 'busboys or similar employees' and employees who are managers or 'agents' of the employer." *Id.* (quoting NYLL § 196–d) (alterations adopted); *see also Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 471–72 (2013) (defining "similar employees" as those who are "ordinarily engaged in personal customer service").

Second, under the FLSA, "tipped employees who spend a substantial amount of time, or more than twenty percent of their workweeks, engaged in related but non-tip-producing work must be paid the full minimum wage for the time spent performing the non-tipped work." *Chhab v. Darden Rests., Inc.*, 11–CV–8345 (NRB), 2013 WL 5308004, *3 (S.D.N.Y. Sept. 20, 2013)

(citing U.S. Dep't of Labor, Wage & Hour Div. Op.).  Under the NYLL, the time period is "2 hours or more or for more than 20 percent of her or his shift, whichever is less."  12 NYCRR § 146–3.4.

Plaintiffs claim that Defendants were not entitled to pay them at the tip credit rate because they were required to split tips with non-service employees and spent more than twenty percent of their time performing non-tip-producing work.

        1.       80/20 Rule

Marquez testified that she was required to sweep, mop, clean up vomit, and move tables and chairs to and from the basement at the start and end of her shift.[2]  She claimed that sweeping and mopping took approximately 45 minutes to two hours a day; cleaning vomit took about 20 minutes a day, three or four times a week; and moving approximately 27 tables, with the help of five or six other waiters and waitresses—as well as "picking up everything" at the end of her shift—took about an hour to an hour and a half a day.  (Tr. 30:8.)  She relies upon an audio recording, purportedly of a conversation in which a manager—Eduardo Amaury Collado—tells the waitresses to bring the tables and chairs down to the basement after the lounge has closed.  (Pl.'s Exs. 11, 39 & 45.)  She also relies upon daily sales reports, which frequently show a period of one or two hours between when she clocked in and processed her first order, or between when she processed her last order and clocked out.  (Pl.'s Ex. 31.)  She testified that these gaps reflect times when she was moving and organizing tables and chairs, mopping, and cleaning.

Mendez testified that she had to clean the bathrooms and the buffet area, sweep the rugs, mop, clean the coffee and juice machines, replenish the refrigerators, and maintain the food at

---

[2] She also testified that she had to carry hookahs from the basement to her customers.  Even accepting her testimony as true, this was part of her tip-producing work because she earned tips on hookahs and had to likewise carry food and drinks from the kitchen and the bar.  (Tr. 29:1–5.)

the buffet. With respect to timing, she claimed that she generally spent three to three and a half hours a night cleaning up after customers—*i.e.*, clearing and cleaning tables and sweeping garbage off of the floor; 45 minutes cleaning the bathrooms; 20 to 25 minutes replenishing the refrigerators; and half an hour cleaning the juice and coffee machines. She also testified that she cleaned steadily every night toward the end of her shift for two to two and a half hours. Finally, she said that she spent about four to four and a half hours just serving customers.

  Defendants offered as a witness Jose Alvarez, who initially worked as the "steam guy" who maintained the buffet and later served as a cashier and a waiter during Mendez's shift. As to Marquez's testimony, he said that the entire process of moving tables took about ten minutes because it was done as a team, and while the female employees moved the tables and chairs to the basement door, the males would take them downstairs from there. He also testified that it was the dishwasher's responsibility to clean up vomit and he had seen Marquez do so only once or twice, and it was common for employees, including Marquez, to stick around after closing and eat free breakfast and talk about the night while still on the clock. As to Mendez's testimony, Alvarez testified that cleaning bathrooms entailed a quick sweep of trash on the floor that took five minutes; sweeping the rugs took 5 minutes; cleaning the juice and coffee machines took, at most, 15 minutes; and he saw Mendez clean and move the rugs very rarely.

  Maribel Nunez, who was often present at the restaurant, corroborated Alvarez's testimony. She said that the moving of tables and chairs was very quick (15 to 20 minutes) because everyone worked as a team, including kitchen staff and the hookah preparers; the women would only slide the furniture to the basement door; the dishwasher was responsible for cleaning up vomit; the waitresses did not have to clean the bathrooms as the company had a porter come every morning at 7 a.m.; and Mofongo House allowed employees to eat and talk while on the clock at the end of their shift. Yudy Vasquez, a cocktail waitress who worked

7

alongside Marquez, likewise testified that the process of moving tables took about 15 minutes; the dishwasher cleaned vomit, and she never saw Marquez do so; and at the end the waitresses would count their tips, pick up bottles and clear tables (which took about 15 minutes), and sit around and talk, and Marquez usually joined.

The audio recording relied upon by Marquez is not helpful. While the translation reflects a male voice directing someone to take the tables and chairs down (Ex. 45, 2:12–16), it does not indicate who was moving the furniture downstairs or how long the process took. It therefore plausibly supports either side's version of the facts. The sales reports are likewise ambiguous given Defendants' witnesses' explanation. The issue therefore turns upon the credibility of the witnesses.

The Court finds that Defendants' witnesses were more credible than Plaintiffs. This finding is based on the demeanor of the witnesses as well as the consistency and substance of their testimony. The Court found particularly incredible Plaintiffs' testimony as to the time it took to perform certain tasks, when compared to the time estimated by Defendants' witnesses. It is difficult to believe, for instance, that it would take seven or eight waiters an hour and a half to move 27 tables; that the length of the restaurant was more than the length of the courtroom given photographs submitted by Defendants (Def.'s Ex. 15); or—as Marquez testified—that one could spend 20 minutes looking for a mop. It is also hard to credit Mendez's testimony that she cleaned consistently for two to two and a half hours every night, or that she spent more than three hours a night just clearing tables for her customers and picking up garbage off the floor, given that she took a 20 minute break and said she spent four to four and a half hours serving customers, and her entire shift lasted only seven and a half hours. Moreover, Plaintiffs acknowledged that a porter came in to clean at 7 a.m., which raises the question why Mofongo

House would require waitresses to thoroughly mop and clean the restaurant if someone was coming in just an hour or two later for that very purpose.

The estimations of time provided by Defendants' witnesses were far more reasonable and were largely consistent. On their version of the facts, Marquez and Mendez spent well less than twenty percent of their time performing non-customer-service related work. Plaintiffs therefore have not demonstrated by a preponderance of the evidence that Defendants violated the 80/20 rule, and the Court finds in favor of Defendants on this claim.

### 2. Tip Sharing

Marquez testified that she was required by Alberto and management—first Eduardo Rodriguez and later Collado—to share tips with the bartenders, hostess, hookah preparers, and management.[3] She again relies upon two audio recordings which, according to her, capture conversations in which hookah preparers demanded tips from the waitresses. (Exs. 11, 39 & 45; 48, 54 & 58.) Mendez similarly testified that she was required to share tips with other waiters, the cashier, and the steam guy.

Defendants again offered testimony from Alvarez, Vasquez, and Maribel, as well as Collado. Alvarez testified that any tip-sharing arrangements between employees were voluntary and did not involve Alberto or management. Vasquez likewise testified that she and her co-workers agreed to share tips with other service employees and did not share any tips with management. This testimony was corroborated by Maribel, who said she had never heard any

---

[3] Even if she had been required to share tips with bartenders and the hostess, this would not violate the tip credit rule because those individuals regularly interacted with customers. (Tr. 47:6–8, 50:2–4, 192:9–20); *see also Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 301–02 (6th Cir. 1998) (hosts); *Garcia v. La Revise Assocs. LLC*, 08–CV–9356 (LTS), 2011 WL 135009, *7 (S.D.N.Y. Jan. 13, 2011) (bartenders); Letter from Dep't of Labor, Wage & Hour Div. (Nov. 4, 1997), 1997 WL 998047 ("[S]ervice bartenders are among those who may participate in a tip pool.").

complaints about tip-sharing arrangements, and Collado, who testified that he neither required nor accepted tips as a manager because he was a salaried employee.

The recordings relied upon by Plaintiffs are, again, not particularly probative. While the translation for Exhibit 11 refer to "seventeen pesos," it is again too fragmented and incomplete to determine the context and meaning of the statement. (Ex. 45, 5:21.) Moreover, even on Marquez's understanding, the recording does not provide a basis to reasonably infer that tip-sharing was required by Defendants, rather than voluntarily agreed upon among service employees. Nor does it suggest anything beyond a dispute about tip-sharing among non-managerial employees. Exhibit 48 is even less favorable for Plaintiffs because it suggests that tips were allocated not based upon a policy, but rather upon whether other employees were helping the waitresses move tables and chairs at the end of the night; indeed, one female voice states: "Don't give me that nonsense because *I'm not bound to tip you* if you raise it for me."[4] (Ex. 58, 8:4–6 (emphasis added).) The question whether Plaintiffs were required to share tips with non-service employees therefore again turns upon the testimony at trial, and the Court again finds that Defendants' witnesses were more believable than Plaintiffs. Consequently, Plaintiffs are not entitled to relief on this basis and Defendants' use of the tip credit was proper.

C.  **Overtime and Off-the-Clock Claims**

Both federal and state law require employers to pay employees at the rate of one and one-half times their regular hourly rate for hours worked in excess of 40 per week, and, of course, to pay employees for all hours worked. 29 U.S.C. §§ 206(a), 207(a); 12 NYCRR §§ 2.2–2.4. The plaintiff bears the burden of proving that she performed work for which she was not properly

---

[4] While Marquez testified that Collado can also be heard on Exhibit 48 demanding tips, the transcript and translation reference him only once (Ex. 58, 10:20 ("Amauri")) and the context is too vague to corroborate her testimony. Similarly, Exhibit 60 may reference "Amaury" multiple times, but the transcript and translation are too incomplete to be of help.

compensated and that the employer had actual or constructive knowledge of that work. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946). She may satisfy this burden by "producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687. Where the employer has failed to keep adequate records of work performed, the solution is not to penalize the employee, but to permit her to rely upon "estimates based on [her] own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (citations omitted). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88. If the employer fails to meet its burden, then the court may award damages, "even though the result be only approximate." *Id.* at 688. Marquez asserts a claim for off-the-clock work and Mendez asserts a claim for unpaid overtime.[5]

### 1. Marquez's Off-the-Clock Claim

Mofongo House employees recorded their hours by clocking in and out of a Point of Sale ("POS") computer system. Marquez testified that for about three to four days a week, primarily during the first year of her employment, she was required by Rodriguez to clock out and continue working for half an hour to two hours, picking up and preparing for the next shift. She also testified that employees were required by Alberto and management to go to monthly meetings that lasted two to three hours but were not paid for their time.

In contrast, Alvarez testified that he was always paid for the hours he worked, and Vernhis Mata, who was in charge of payroll, testified that all employees were always paid properly. In addition to this testimony, Defendants presented Marquez with contemporaneous

---

[5] After the completion of their case, Marquez withdrew her overtime claim and Mendez withdrew her off-the-clock claim.

time records for each day that she worked (Def.'s Ex. 13), along with forms that she had to sign each week to receive payment, reflecting the amount she was being paid and the time for which she was being paid. (Def.'s Ex. 1.) Marquez acknowledged that she had to sign these latter forms, but claimed she never looked at them because there was a line of employees waiting for their pay and she was rushed. She also could not identify any dates, or even weeks, when Defendants' records were incorrect. The Court finds Defendants' witnesses' testimony on these issues more credible than Marquez's testimony. Accordingly, the Court finds that Marquez has not satisfied her burden of proof and finds for Defendants on this claim.

### 2. Mendez's Overtime Claim

Mendez testified that Defendants sometimes did not pay her overtime, and relies upon certain pay statements that show her receiving her ordinary pay rate for work over 40 hours per week. (Pl.'s Exs. 5–7.) In contrast, Defendants provided another set of records reflecting that she was paid for overtime (Def.'s Ex. 1), and Mata and Maribel testified that the discrepancy between the two records was due to a glitch in the Aldelo computer system. Mata further testified that she called the system's company several times to report the error, but they could not fix it, and to resolve the issue she would personally check the records each week and make sure employees were properly paid. As with Marquez, Defendants also rely upon weekly pay forms, which Mendez signed. (Def.'s Ex. 5.) She also claims that she did not review these for accuracy because of the long line.

The Court again finds Defendants' witnesses' testimony more credible. The Court is not persuaded that in fact—as Mendez claims—Defendants sometimes paid her overtime and sometimes did not. She also could not identify any specific day or week when she was not properly paid. And the records upon which she relies support Defendants' testimony that there was a system glitch. One exhibit, for instance, shows that Mendez was paid at her regular rate

for overtime hours, but the entry directly below hers shows an employee who was paid at the proper overtime rate. (Pl.'s Ex. 5 at 14.) Accordingly, the Court finds in favor of Defendants on Mendez's overtime claim.

### D.     Wage Statement Claims

#### 1.      Yearly Statements

The NYLL requires employers to provide employees with a written notice at the time of hiring and annually before February 1, in English and the employee's primary language, of the employee's rate of pay, overtime pay rate, the basis for the pay (*e.g.*, hourly, daily, salary), all allowances claimed as part of the minimum wage (*e.g.*, tips), the regular pay day, and the employer's name, address, and telephone number. NYLL § 195(1)(a). The employer also must obtain from the employee a "signed and dated written acknowledgment, in English and in the primary language of the employee, of receipt of this notice," which it must retain for six years. *Id.*

Defendants presented the notices of pay for Mendez in 2011 and 2013 and for Marquez in 2011 (she was not employed in 2013). (Def.'s Ex. 3–5, 11.) However, they did not have Plaintiffs' notices of pay for 2012—according to Defendants, because of a flood in their basement. Plaintiffs both testified that they never received or signed a copy of the 2012 notice of pay. When Marquez was presented with her 2011 notice, however, she denied having signed it—despite the presence of her signature and the conceded similarity between her signature on the notice and on an employee handbook, which she admitted to having signed. (Def.'s Exs. 11, 12.)

The Court declines to credit Plaintiffs' testimony on this claim. It is beyond reasonable dispute that they received and signed the 2011 and 2013 notices, and it is illogical to conclude that Defendants would suddenly stop complying with the law in 2012 only to begin again in

2013.  Defendants' explanation for the lack of 2012 notices was plausible and credible, and Plaintiffs presented no evidence to undermine it.  Marquez also undermined her credibility by denying having signed the 2011 notice.  The Court finds for Defendants on these claims.

### 2. Daily Statements

In addition to annual statements, employers must "furnish each employee with a statement with every payment of wages," which lists the dates the payment covers, the employee's name, the employer's name, address, and telephone number, the rate and basis of pay, gross wages, deductions, allowances, and net wages.  NYLL § 195(3).  The New York Department of Labor has issued an opinion indicating that employers comply with this provision if they give employees access to their wage statements on a computer system from which employees have the option to print.  N.Y. Dep't of Labor Op., RO–08–0096 (Aug. 11, 2008).

Marquez testified that she was initially paid cash in an envelope—without any weekly pay statement—until February or March of 2011, when she began to be paid via direct deposit.  Plaintiffs submitted weekly wage statements for Marquez, which span the pay period for August 14, 2011 through the end of her employment.  Since Marquez began working at Mofongo House on April 14, 2010, it is possible that she did not receive such statements for the first year and four months of her employment.  But she testified that these were not all of the weekly pay stubs she received, and Maribel testified that the same information was available on the computer system throughout Marquez's employment.  Marquez and Mendez also testified that they were capable of printing their daily sales reports from the system.  (Pl.'s Ex. 1.)  While Mendez testified that the computer system did not provide as detailed of information as did the weekly pay stubs, the Court declines to credit her testimony over that of Maribel, and infers that Plaintiffs were likewise capable of printing their weekly wage statements from the system.  Accordingly, the Court finds for Defendants on these claims.

### E.     Unauthorized Deduction Claims

#### 1.     Uniforms and Costumes

Under the NYLL, "[w]hen an employee purchases a required uniform, he or she shall be reimbursed by the employer for the total cost of the uniform no later than the next payday." 12 NYCRR § 146–1.8.  A required uniform is "clothing required to be worn while working at the request of an employer . . . *except* clothing that may be worn as part of an employee's ordinary wardrobe," meaning "ordinary basic street clothing selected by the employee where the employer permits variations in details of dress."  *Id.* § 146–3.10.

Marquez testified that Defendants made her purchase various costumes for special events such as Halloween, as well as uniforms of different colors and articles of clothing that she did not wear outside of work.  Mendez likewise testified that she had to purchase various uniforms.  Marquez offered a number of pictures of such clothing as exhibits.  (Pl.'s Exs. 14–30.)  In some of these pictures, such as exhibit 14, several employees are shown wearing the same outfit, which could suggest that she was required by Defendants to purchase and wear specific outfits.

Defendants' witnesses offered a different explanation.  Mata testified that employees were provided with uniforms, and that the waitresses voluntarily decided sometimes to wear costumes to have themed nights and bring in more money.  Mata also testified that Marquez never presented any receipts to her or complained that she was being made to purchase clothing for work.  While Mata did sometimes purchase costumes online for the employees, it was at their request because it was difficult for them to pool together the money to make a single credit card purchase online.  Vasquez similarly testified that she was never required to pay for a uniform, and that the decision to purchase costumes was voluntary and made as a group by the waitresses.  Alvarez also testified that he was provided with a uniform but that it was fine for employees to

15

wear regular clothes, so long as the clothes were black, and he was never required to pay for work clothing.

Plaintiffs rely upon Exhibit 51, which Marquez claims is a recording of a conversation in which Collado demanded that she pay him for a Halloween costume for work. (Exs. 51, 56 & 61.) While the transcript of this conversation does refer to "money" and a "uniform" (Ex. 61, 3:14–16), the context is too unclear to support her testimony. Plaintiffs also rely upon Exhibit 10, which Marquez described as a conversation in which Collado demanded $36 for a costume. (Exs. 10, 38 & 44.) The transcript in this case clearly shows a female voice asking how much a uniform is and a male voice saying it is "Thirty-six." (Ex. 44, 2:14.) But again, this recording is only minimally helpful because it is equally consistent with Defendants' testimony that the waitresses would coordinate outfits and ask Defendants to make purchases online. Finally, Plaintiffs rely upon Exhibit 12, which purportedly captures a conversation in which another waitress complains that the price of a purse, which is part of a uniform, is $65 instead of $20 as she thought. While the transcript for this conversation mentions $20, it does not mention $65. Moreover, it is again consistent with the notion that the waitresses agreed to purchase a particular item and, in this case, the cost was more than one waitress expected. Given the limited relevance of the recordings, and the Court's credibility determination as to Plaintiffs and Defendants' witnesses, the Court again finds in favor of Defendants with respect to these claims.

### 2. Skipped Bills

Section 193(3) of the NYLL prohibits an employer from making "any charges against wages, or require[ing] an employee to make any payment by separate transactions unless such charge or payment is permitted as a deduction from wages." Marquez testified that Defendants made her pay the bills of her customers who left without paying and that she paid approximately $1,000 to $1,500 over the course of her employment. Specifically, she recalls an incident when a

customer skipped out on a $350 bill for a bottle of Chivas Regal, a bottle of tequila, and an octopus salad.  She relies upon Exhibit 52, which is purportedly a recording of a conversation in which another waitress is complaining because Mata automatically deducted money from her check for a customer's unpaid bill.  (Exs. 52, 57 & 62.)  There is, however, no mention of Mata or a deduction in the transcript.  Rather, there is only a reference to someone "charg[ing] my check's bill" for a bottle that the customer "didn't consume."  (Ex. 62, 3:4–7.)  The recording therefore lacks probative value as to this claim.  Moreover, when Marquez was presented with her contemporaneous time records, she could not identify a single day when she was required to pay for a customer's bill.

In contrast, Mata testified that she never heard about Marquez having to pay for skipped bills, even though she would be the one to whom such complaints would be made.  Vasquez testified that if customers did not pay their bills, employees would make a note in the computer and it would be removed from the system.  As Defendants' counsel noted during his summation, it seems unlikely that Marquez—who was building a case by making recordings in 2011 and 2012 regarding alleged discrimination—would not also keep documents regarding, for instance, improperly deducted money.  In light of the evidence, the Court finds for Defendants on this claim as well.

**III.     Conclusion**

Based upon the foregoing findings of fact and conclusions of law following trial in this matter, the Court finds that Plaintiffs have not proven any of their claims by a preponderance of the evidence and that Defendants are entitled to judgment in their favor.  The Clerk of Court is directed to enter judgment in Defendants' favor on all claims and to close this case.

SO ORDERED.

Dated: August 28, 2014
       New York, New York

_____
J. PAUL OETKEN
United States District Judge